[No. G038380. Fourth Dist., Div. Three. Feb. 29, 2008.]

SAMUEL METTERS, Plaintiff and Respondent, v.
RALPHS GROCERY COMPANY et al., Defendants and Appellants.

**COUNSEL**

Littler Mendelson, Henry D. Lederman and Lauren D. Hymes for Defendants and Appellants.

Pedersen Law & Dispute Resolution Corp., Neil Pedersen and Dan E. Heck for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.**—Ralphs Grocery Company appeals from the order denying its motion to compel arbitration of the action for discrimination and harassment filed against it by its employee, Samuel Metters. It claims the trial court erred in finding there was no valid agreement to arbitrate. We affirm.

## FACTS

Samuel Metters sued his employer, Ralphs Grocery Company, and his store manager, Bill Frigo (collectively, Ralphs), for racial discrimination and harassment in violation of the California Fair Employment and Housing Act (Gov. Code, § 12940 et seq.) (FEHA). Ralphs moved to compel arbitration, claiming Metters had entered into a binding arbitration agreement when he filled out a dispute resolution form.

Ralphs set forth evidence showing that Metters answered "yes" to the question: "Do you . . . have any complaints or incidents of unlawful harassment, discrimination or retaliation that you want to report?" on his

annual evaluation form in early 2005. On March 9, 2005, Bonnie Franco, the manager of employee relations, sent Metters a letter. Franco's letter advised she was enclosing the "Notice of Dispute & Request for Resolution form ('Dispute Form'), the Company's Policy Against Unlawful Harassment, Discrimination and Retaliation, and a copy of the most recent version of the Policy referenced on page 2 of the Dispute Form, all of which address the means by which you may provide us with detailed information about your dispute and your desired resolution." Franco asked Metters to return the information about his dispute within 15 days. "The information you provide on the Dispute Form or otherwise will be used to conduct a reasonable review of your dispute and to respond to your desired resolution." Franco continued, "If, within 15 days from the date of this letter, we do not (1) receive the requested information back from you, or (2) hear from you further about your dispute, we will review your dispute based on the information you have already provided us about it." Metters did not respond.

In August 2005, Metters called the "Ask Dave" hotline about his dispute. In response, Franco sent Metters another letter virtually identical to the first, referencing the same enclosures. A month later, Metters signed and submitted the two-page dispute form claiming harassment and discrimination based on race, color, and national origin/ancestry from "June 2004 to present."

The dispute form is entitled "Notice of Dispute & Request for Resolution." On the lower half of the second page of the dispute form, the heading "IV. Mediation & Binding Arbitration." appears, followed by this sentence: "The Company's Dispute Resolution Program includes a Mediation & Binding Arbitration Policy (the 'Policy'). The Policy provides for one day of voluntary mediation (*only if both you and the Company agree*) of 'Covered Disputes' (as defined in the Policy) with a neutral third-party mediator at the Company's expense, and requires the resolution of such Covered Disputes only through mandatory final & binding arbitration by a neutral third-party arbitrator (instead of a judge or jury) if they are not or cannot be resolved through mediation pursuant to the Policy or other informal dispute resolution efforts."

After a space, the form states, "I hereby submit this dispute for informal resolution directly by the Company's management." Then follows a rectangle with black background and white lettering, which says, "By submitting the foregoing dispute for resolution, I hereby acknowledge, understand, and agree that (1) a copy of the most recent version of the Policy (as described above) has been made available to me through the Company's Manager of Employee Relations (contact information below) prior to submitting the dispute for resolution, (2) I have received, read, understand, and will fully comply with the most recent version of the Policy, (3) if any of my Covered Disputes

under the Policy are not resolved directly with the Company's management and I wish to pursue them further, I must resolve them only through voluntary mediation and/or mandatory final and binding arbitration pursuant to the most recent version of the Policy, and (4) I have not been required to complete, sign or return this form to make a complaint under the Company's policies against unlawful harassment, discrimination and retaliation or to have such complaints investigated or remedied by the Company."

In opposition to the motion to compel arbitration, Metters declared he started complaining about harassment, discrimination and retaliation in August 2004. At that time, he "contacted the district manager of Ralphs as well as Bonnie Franco at labor relations and the 'Dave Hirsch' phone line to complain . . . . The district manager responded by advising me to take vacation time. While on vacation, in the beginning of September, my doctor placed me on stress leave. During my leave I contacted Ralphs and asked them to investigate my claims . . . ." Metters claimed in September 2005 he made "more than a dozen attempts to contact Bonnie Franco in the department of labor relations and have her address my complaints. At the same time I made numerous attempts to have the matter resolved by Dave Hirsch, the president of the company."

Metters claimed he got the dispute form after he contacted the human resources department, but never received a copy of the policy. After he got the dispute form, he contacted Bonnie Franco, and she "instructed [him] to fill out the form and submit it to Ralph's legal office without any further explanation." Metters understood he needed to complete, sign, and submit the dispute form before his claims would be investigated. Neither Franco nor anyone else told Metters about arbitration, and he was unaware he had signed an arbitration agreement. He claimed he never agreed to arbitrate his claims against Ralphs.

In response to Metters's declaration, Franco filed a supplemental declaration stating she was "not aware of any attempts by Samuel Metters to contact me during September 2005." She claimed "[a] copy of Ralphs' Mediation & Binding Arbitration Policy was available to Mr. Metters prior to him signing the DRP form. At no time did Plaintiff request I provide him with another copy of the Policy." Franco denied instructing Metters to submit the form. "If an employee calls with questions regarding the DRP form, my standard response is 'it is helpful if you fill out the DRP form, however, you are not required to do so.' "

After hearing argument, the trial court found there was no meeting of the minds and therefore no valid arbitration agreement. The court observed, "It could be that a transactional attorney sitting in an office somewhere could

have this form, start kind of pulling on the string and follow it back somehow and maybe figure out what it meant, if that is possible. . . . [¶] . . . [¶] . . . [I]t does appear to be an attempt to sort of backdoor . . . this employee through this kind of ambiguous, nebulous form and say, well, if you want your . . . complaint investigated, just sign this and life will be good. [¶] I don't think I can find there is . . . in the real world a meeting of the minds between Mr. Metters and Ralphs based on this."

## DISCUSSION

Ralphs contends the agreement to arbitrate is valid and Metters is bound by it. There is no dispute that Metters signed the agreement, which states he received and read the arbitration policy; thus, Ralphs argues, it must be presumed he had done so. Ralphs contends its burden to establish a valid agreement to arbitrate is met by supplying a copy of the agreement and showing that Metters signed it.

■ The Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA) provides that a written arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (FAA, § 2.) The FAA was "designed 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate,' [citation], and to place such agreements ' "upon the same footing as other contracts." ' " (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [103 L.Ed.2d 488, 109 S.Ct. 1248].) This federal policy in favor of arbitration does not come into play, however, until a court has found the parties entered into a valid contract under state law. " 'There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate.' " (*Cione v. Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625, 634 [68 Cal.Rptr.2d 167].)

Ralphs urges us to perform a de novo review of the trial court's finding that there was no arbitration agreement, claming the issue is a question of law. But the trial court properly considered extrinsic evidence and made factual determinations; accordingly, we review the record for substantial evidence to support the finding. (*City of Vista v. Sutro & Co.* (1997) 52 Cal.App.4th 401, 407 [60 Cal.Rptr.2d 488].)

■ Ralphs relies on the general rule that "ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms. A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing. [Citations.]" *Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1049 [107 Cal.Rptr.2d 645].) This is so even where the contracting party relied on

misrepresentations by the other party that it was not necessary to read the contract before signing. "[O]ne party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract." (*Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, 423 [58 Cal.Rptr.2d 875, 926 P.2d 1061].)

But if the one who signs the instrument is unaware of the contractual provisions, he cannot be said to have agreed to them. Thus, "[a]n exception to [the] general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient. In such a case, no contract is formed with respect to the undisclosed term. [Citations.]" (*Marin Storage & Trucking, Inc. v. Benco Contracting & Engineering, Inc., supra*, 89 Cal.App.4th at pp. 1049–1050.) In *Windsor Mills, Inc. v. Collins and Aikman Corp.* (1972) 25 Cal.App.3d 987 [101 Cal.Rptr. 347], the court found an arbitration provision unenforceable because it was buried in small print on the reverse side of a form on which a carpet manufacturer acknowledged receipt of yarn shipments from the yarn distributor. The court found an offeree was not bound by "inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious. [Citations.] [¶] This principle of knowing consent applies with particular force to provisions for arbitration." (*Id.* at p. 993.)

■ Here, the trial court found the dispute form did not look like a contract and did not alert Metters that he was agreeing to binding arbitration. It was entitled "Notice of Dispute & Request for Resolution." According to Metters's declaration, he was told to fill out the form in order to submit his dispute for resolution. He had tried telephone calls to both Franco and the company president; neither had produced results. The letters he received from Franco as well as his conversation with her strongly suggested the form was the only vehicle by which he could have his claims reviewed, and no one told him if he did so, he would automatically agree to arbitration.

Ralphs argues Metters should have known he could have submitted his dispute without filling out the dispute form because Franco's letters said Ralphs would investigate his dispute based on "[t]he information you provide on the Dispute Form or otherwise . . . ." (Underscoring added.) But Metters had provided information by other means, apparently with no results. Had Ralphs wanted to clarify, rather than obfuscate, the grievance procedure, it would have told Metters to either fill out the dispute form, under which he would agree to binding arbitration, or write a letter detailing his dispute.

The arbitration provisions of the dispute form are similarly confusing and full of legalistic references to the unattached policy. The form explains that

the policy applies to "Covered Disputes," but fails to define such disputes. It further explains that Covered Disputes will be resolved through "voluntary mediation and/or mandatory final and binding arbitration" if not resolved by informal means. The form then states its ostensible purpose on the employee's behalf: "I hereby submit this dispute for informal resolution directly by the Company's management." Between this statement of purpose and the employee's signature line is the black box containing the employee's promise to follow the terms of the policy.

Ralphs argues the dispute form incorporates the policy by reference, thus Metters is presumed to know its terms, which define "Covered Disputes" and explain that participation in formal dispute resolution requires binding arbitration. Ralphs cites *Spellman v. Securities, Annuities & Ins. Services, Inc.* (1992) 8 Cal.App.4th 452 [10 Cal.Rptr.2d 427] in support of its contention that Metters is bound by the terms of the policy.

In *Spellman,* a seller of securities brought an action for wrongful termination against his employer, a securities dealer. The employer moved to compel arbitration pursuant to the employment contract. The contract expressly required arbitration of disputes between the employee and employer as provided in the organization's "rules, constitutions, or by-laws . . . ." (*Spellman v. Securities, Annuities & Ins. Services, Inc., supra,* 8 Cal.App.4th at p. 458.) The court found that the documents to which the contract referred, which contained the arbitration clause, were properly incorporated by reference because they were " 'clearly referred to and identified.' " (*Ibid.*) It also noted the employee's agreement to arbitrate "appear[ed] on the signature page of [the] form under the bold face heading warning applicants that they must read the paragraphs on that page 'Very Carefully.' " (*Ibid.*)

Metters received no such warning on the dispute form. Furthermore, the agreement to arbitrate was not contained in an employment contract, where it might have been expected, but in a form on which Metters was directed to submit his grievance. The context of this form did not alert him he was agreeing to anything, let alone arbitration.

■ Metters claimed he never received the policy. But had he done so, he would have learned that although the policy does not prevent an employee from "pursuing an informal resolution of [Covered D]isputes," it requires the employee to sign and submit a dispute form to do so. In other words, an employee has no real choice to avoid arbitration if he wants some action taken on his complaint. When, as here, the complaint is for discrimination under the FEHA, the employer's duty to investigate promptly is "affirmative

and mandatory," not dependent on whether the employee agrees to arbitration. (*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035–1036 [127 Cal.Rptr.2d 285]; Gov. Code, § 12940, subds. (j)(1), (k).)

## DISPOSITION

The record contains substantial evidence to support the trial court's finding that there was no valid agreement to arbitrate Metters's discrimination claim. The order denying the motion to compel arbitration is affirmed. Respondent is entitled to costs on appeal.

Aronson, J., and Fybel, J., concurred.